## In re CRAZY EDDIE SECURITIES LITIGATION.

No. 87 C 33.

United States District Court, E.D. New York.

March 10, 1993.

As Amended March 17, 1993.

Sirota & Sirota (Howard B. Sirota, of counsel), Milberg, Weiss, Bershad, Specthrie & Lerach, Pomerantz, Levy, Haudek, Block & Grossman, Stull, Stull & Brody, Lowey,

Dannenberg, Bemporad, Brachtl & Selinger, P.C., Kaufman, Malchman, Kaufman & Kirby, Law Offices of Harvey Greenfield, Christopher Lovell, P.C., Law Offices of Joseph H. Weiss, Abbey & Ellis, New York City, for Class plaintiffs.

Milbank Tweed Hadley & McCloy (C. Stephen Howard, Suzanne Toes, of counsel), Los Angeles, CA, and New York City, for plaintiff Oppenheimer–Palmieri Fund Ltd.

Folkenflik & McGerity (Max Folkenflik, Margaret McGerity, of counsel), New York City, for plaintiffs Entertainment Marketing Inc. and Elias Zinn.

Cadwalader, Wickersham & Taft (Howard R. Hawkins, Jr., of counsel), New York City, for Crazy Eddie, Inc.

Shearman & Sterling (Joseph McLaughlin, of counsel), New York City, for defendants Peat Marwick Main & Co. and KMG Main Hurdman.

Kaye, Scholer, Fierman, Hays & Handler (Steven Glassman, of counsel), New York City, for defendant Oppenheimer & Co., Inc.

Davis, Markel & Edwards (Thomas J. Sweeney, III, of counsel), New York City, for defendant Peat Marwick Main & Co.

Weil, Gotshal & Manges (Dennis J. Block, of counsel), New York City, for defendants Salomon Bros. Inc., Bear, Stearns & Co., Inc., and Wertheim Schroder & Co., Inc.

Wilson Elser Moskowitz Edelman & Dicker (Richard Oelsner, of counsel), New York City, for defendants Penn and Horowitz, J. Liebman & Co., Gary Perlmutter and Mark Halperin.

Hoffman & Pollok, New York City, for defendants Jacob Tambor, Sasson Cohen and Zazy Intern. Corp.

Rosenman & Colin, New York City, for defendants Leonard Rubin, Richard Portnoy and Wren Distributing Co.

Warner & Joselson (Jonathon D. Warner, Sheryl L. Bregman, of counsel), New York City, for defendant Sam E. Antar.

Beldock Levine & Hoffman (Brian E. Maas, of counsel), New York City, for defendant Isaac Kairey.

Leader & Berkon (Frederick D. Berkon, of counsel), New York City, for defendants Eddie Antar, Solomon E. Antar, Edmond Levy, William H. Saltzman, Steve Pasquariello, and Carl G. Zimel.

David M. Rubin, New York City, for defendant Abraham Grinberg.

Morgan, Lewis & Bockius (Kevin T. Rover, of counsel), New York City, for defendant David V. Panoff.

Kelley, Drye & Warren (John P. Marshall, of counsel), New York City for defendant James H. Scott, Jr.

Eddie Antar, pro se.

Eddie Gindi, pro se.

Jean Cocchiara, pro se.

Kathleen Morin, pro se.

David Neiderbach, pro se.

Arnold Spindler, pro se.

Hellring Lindeman Goldstein & Siegal (Stephen L. Dreyfuss, Matthew E. Moloshok, of counsel), Newark, NJ, for defendants Danielle Antar, Deborah Rosen Antar, Gabrielle Antar, Simone Antar, Nicole Antar and Noelle Antar.

Law Offices of Raoul Lionel Felder, P.C., New York City, for defendant Deborah Rosen Antar.

Gersten, Savage, Kaplowitz & Curtin, New York City, for defendants Michelle Antar, Rose Antar, Rose M. Antar, Rori Antar, Sam A. Antar, Sam M. Antar, Allen Antar, Adam Kuszer, Benjamin Kuszer, Ellen Kuszer, Simon Kuszer and Lillian Rosen.

Kostelanetz Ritholz Tigue & Fink, New York City, for defendants Rose Antar and Sam M. Antar.

## AMENDED MEMORANDUM AND ORDER

NICKERSON, District Judge:

Numerous memoranda and orders of this court have recounted the facts of this litigation. The court assumes familiarity with its previous published memoranda and orders dated December 30, 1988, *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962 (E.D.N.Y.1988);

June 16, 1989, *In re Crazy Eddie Sec. Litig.*, 714 F.Supp. 1285 (E.D.N.Y.1989); June 19, 1990, *In re Crazy Eddie Sec. Litig.*, 740 F.Supp. 149 (E.D.N.Y.1990); September 19, 1990, *In re Crazy Eddie Sec. Litig.*, 747 F.Supp. 850 (E.D.N.Y.1990); March 6, 1991, *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39 (E.D.N.Y.1991); May 1, 1992, *In re Crazy Eddie Sec. Litig.*, 792 F.Supp. 197 (E.D.N.Y. 1992); September 4, 1992, *In re Crazy Eddie Sec. Litig.*, 802 F.Supp. 804 (E.D.N.Y.1992) (the "September 1992 Order"); and January 20, 1993, *In re Crazy Eddie Sec. Litig.*, 812 F.Supp. 338 (E.D.N.Y.1993).

Defendants Wertheim Schroder & Co. ("Wertheim"), Bear, Stearns & Co. Inc. ("Bear Stearns") and Salomon Brothers Inc ("Salomon") move for summary judgment with respect to claims against them under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and claims based on common law fraud and negligence. Because the common law fraud and negligence claims against them were dismissed by this court in its September 1992 Order, 802 F.Supp. at 812–13, this opinion addresses only the section 10(b) claims.

## I

The critical facts may be quickly summarized.

Wertheim, Bear Stearns and Salomon (collectively, the "Underwriters") underwrote public offerings of Crazy Eddie stock on March 7, 1986 and debentures on June 24, 1986.

The Class Plaintiffs' Fourth Supplemental Amended and Consolidated Complaint alleges that prior to, in the course of, and subsequent to, these two offerings, Crazy Eddie management engaged in a series of fraudulent schemes designed falsely to portray Crazy Eddie as a thriving, well-managed and profitable enterprise, positioned to grow in the years to come, when in fact the company was losing money in part due to looting by Crazy Eddie management.

The complaint alleges, for example, that (1) Crazy Eddie founder Eddie Antar and other officers skimmed cash from store receipts prior to Crazy Eddie's initial public offering in September 1984 causing post-offering gross sales falsely to suggest extraordinary growth; (2) they later placed some of this skimmed cash into the cash registers of selected stores in order to inflate the growth rate of "same store" sales, a trend that was closely watched by investment analysts; (3) they over-reported company inventory and underreported accounts payable by tens of millions of dollars; and (4) they looted Crazy Eddie inventory through a series of sham transactions.

In late 1987, after Crazy Eddie had been acquired through a tender offer, new management discovered and announced that Crazy Eddie had overstated its inventory by some $65 million. As a result of new management's discovery that former management had consistently overstated company profits and had looted receipts and inventory, the value of Crazy Eddie securities collapsed. Its common stock is now worthless, and its debentures have little value.

Plaintiffs, a class of Crazy Eddie securities purchasers, contend that the Underwriters violated section 10(b) and Rule 10b–5 promulgated thereunder by intentionally or recklessly misleading investors in disseminating the prospectuses in connection with the March and June 1986 public offerings, thereby causing losses to plaintiffs.

## II

Section 10(b) makes it "unlawful for any person, ... [t]o use or employ ... any manipulative or deceptive device or contrivance" in contravention of rules and regulations issued by the Securities and Exchange Commission. 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under that section prohibits, in addition to nondisclosure and misrepresentation, any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b–5.

To establish a claim under section 10(b) and Rule 10b–5 with respect to misleading disclosures, a plaintiff must show "(1) a misstatement or omission by the defendant; (2) as to a material fact; (3) upon which plaintiff relied; (4) and which caused damages. In addition, the plaintiff must show that (5)

defendant acted with scienter; and that (6) the misstatement or omission was made in connection with the purchase or sale of securities." *Morin v. Trupin,* 778 F.Supp. 711, 717 (S.D.N.Y.1991).

### A

The Underwriters contend that the plaintiffs have no evidence demonstrating that (i) the alleged misrepresentations and omissions were material; (ii) the Underwriters acted with scienter; or (iii) plaintiffs' losses can be attributed to material facts known to or recklessly disregarded by the Underwriters.

The parties agree, in substance, as to the legal standards defining materiality, scienter and loss causation.

### 1. *Materiality*

The Supreme Court defined materiality in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), holding, in the context of a false proxy statement, that a fact is material:

> if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

The Second Circuit has adopted the *TSC Industries* standard in claims arising under section 10(b). *See, e.g., Securities and Exch. Comm'n v. Bausch & Lomb, Inc.,* 565 F.2d 8, 14–15 (2d Cir.1977).

■ In determining whether a prospectus is materially misleading, the court may examine the literal truth or materiality of each statement or omission, or the aggregate impression created by the disclosure. *See State Teachers Retirement Bd. v. Fluor Corp.,* 566 F.Supp. 945, 949 (S.D.N.Y.1983) ("it is not any particular item on the laundry list that counts, but rather, it is the totality of the list and its overall impact on potential buyers and sellers that must be considered").

### 2. *Scienter*

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976), the Supreme Court held that, in a private action under section 10(b), plaintiff must show defendant acted with scienter, by which the Court meant "an intent to deceive, manipulate, or defraud." The Court reasoned that the term "manipulative" in section 10(b) "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.* at 199, 96 S.Ct. at 1383. The Court explicitly left undecided the question of "whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* at 194 n. 12, 96 S.Ct. at 1381 n. 12.

Before and since *Hochfelder,* the Second Circuit has held that proof of reckless disregard for the truth satisfies the scienter element "in appropriate circumstances." *See, e.g., Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (defining reckless conduct as "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").

*In re Fischbach Corp. Sec. Litig.,* No. 89–5826, 1992 WL 8715, at *5, 1992 U.S.Dist. LEXIS 373, at *15 (S.D.N.Y. Jan. 15, 1992), the court observed that "actions performed with deliberately cultivated ignorance are a form or intentional conduct" meeting the scienter requirement. The court further explained that:

> Typically, the defendant enjoys a profitable association with another who is willfully committing a fraud.... The defendant is motivated not to 'open his eyes' to the underlying facts, since this would place him in a position of terminating his profitable financial situation and exposing his associate, or continuing his participation in the fraudulent activities, but now without his modicum of deniability. The combination of this motivation and an otherwise unlikely degree of carelessness gives rise

to an inference of deliberate disregard for the facts.

*Id.*, 1992 WL 8715, at *6, 1992 U.S.Dist. LEXIS 373 at *18–19. The *Fischbach* court concluded that "where the circumstances suggest an egregious failure to gather information, which in turn suggests the defendant deliberately shut his eyes to the truth, the scienter requirement is met." *Id.*, 1992 WL 8715, at *6, 1992 U.S.Dist. LEXIS at *19.

### 3. Loss causation

■ Plaintiffs must also show that their losses were caused by defendants' conduct. That is, in addition to proving that plaintiffs relied on material misrepresentations in purchasing Crazy Eddie securities (defendants do not raise here the issue of reliance), plaintiffs must show that the economic harm they suffered occurred as a result of the alleged material misrepresentation or omission. *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992). In order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misleading disclosure. *Id.*

In *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir. 1985), for example, the Second Circuit held that attorneys who assisted in the preparation of material false financial disclosures did not proximately cause plaintiff's losses when the proceeds from the sale of securities were subsequently funneled into unwise investments or diverted to the personal use of the principal officers.

On the other hand, in *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the Second Circuit held that plaintiff investor's losses could be attributed to a brokerage firm whose trainee, who held himself out as a licensed portfolio management specialist, had recommended that plaintiffs purchase and, later, continue to hold certain speculative securities. While the loss in value of those securities was not related to the trainee's misrepresentation about his qualifications, the court found that plaintiff's losses were foreseeably caused by the misrepresentation. *Id.* at 708.

■ Thus, in order to show loss causation plaintiffs must show either that, as in *Bloor*, a misrepresented or omitted fact touched upon the reason for the investment's decline in value, or that, as in *Marbury*, plaintiff's losses were the direct and foreseeable result of plaintiffs' reliance on material misrepresentations.

### B

Plaintiffs point to six instances which, they contend, when viewed separately or as part of a "mosaic," raise a triable issue of fact as to whether the Underwriters made material misrepresentations or omissions, with scienter, which caused loss to the plaintiffs.

The court considers first each misrepresentation or omission in isolation.

### 1. The product sales table

■ Plaintiffs allege that in the course of due diligence inquiries by the Underwriters regarding a product sales table contained in the two prospectuses, the Underwriters did or should have discovered that the table was materially incorrect and that Crazy Eddie officers and employees had lied to them about its preparation.

The papers show that on March 6, 1986, the evening before the March 1986 registration statement was to become effective, the Underwriters requested "comfort" from a Cosmo LaForgia, an auditor from KMG Main Hurdman (later merged with Peat Marwick Main & Co. and referred to here as "Peat Marwick"), regarding a table that analyzed Crazy Eddie sales by product category. The chart had been created by Sam E. Antar, Crazy Eddie's controller and chief financial officer. Contrary to his representation to the Underwriters, the table was based on his best guess and not on data generated by Crazy Eddie's general ledger system. LaForgia refused to provide either comfort or an explanation of his refusal, apparently because he knew that the percentages could not be generated from Crazy Eddie's accounting system.

After the Underwriters became alarmed by LaForgia's failure to explain his reluctance to provide comfort, Sam E. Antar tele-

phoned Alphonse Ferrara, the Peat Marwick partner in charge of the Crazy Eddie account. He told Ferrara that he had lied to the Underwriters about the basis of the table, and he prevailed on Ferrara to find a compromise with the Underwriters that would prevent them from discovering the lie.

Ferrara and the Underwriters agreed that the offering could go forward based on three conditions. First, the explanatory wording in the prospectus would be changed from:

The table below shows the approximate percentage of the Company's combined sales from the nine months ended December 1, 1985 attributable to each of the foregoing product groups.

to:

Based on a recent analysis by the Company of its sales by product group, the Company believes that the approximate percentage of its combined sales attributable to each of the foregoing product groups . . . is as follows.

Second, Peat Marwick would state in its opinion letter that:

We compared the percentage of total sales by product group to the Company's internal "Department Category Sales Report" and found such percentages to be in agreement with that set forth in the Registration Statement.

Third, Crazy Eddie agreed to allow the Underwriters to review Crazy Eddie's internal "Department Category Sales Report" in the near future.

Plaintiffs have offered no evidence that the table was materially false or that the introductory description, that the table was based on a "recent analysis," was materially misleading. Even if the disclosures relating to the table were materially misleading, plaintiffs have offered no evidence or argument that their losses can be attributed to this disclosure.

The court discusses below (pp. 315–16) whether a jury could reasonably find, based on these events and other evidence, that the Underwriters blinded themselves to the obvious implication that Crazy Eddie management had lied about material aspects of company operations and transactions.

## 2. *Misleading sales practices*

■ Plaintiffs offer testimony by Sam E. Antar that Crazy Eddie engaged in deceptive, illegal and misleading sales practices, and that representatives of each Underwriter knew of such practices.

Specifically, Crazy Eddie reportedly engaged in "bait and switch" sales practices. It lured customers into its stores by advertising products at or below cost, then persuaded the customers to purchase a different product in which Crazy Eddie would make a greater profit.

Sam E. Antar testified that a Bruce M. Missett, a Salomon analyst, coached him not to say anything about being a "bait and switch" operation while on "road shows" promoting Crazy Eddie securities to institutionalized analysts because such disclosures were "not good for Crazy Eddie's image" and because Crazy Eddie "would be written off as just another schlock operation."

Insofar as investors did not know of Crazy Eddie's sales practices, such disclosure may have resulted in a different mix of investors. Some investors may have been reluctant to purchase shares in a "schlock operation." But other investors may have had an increased interest in the company, believing it to have aggressive sales policies and persuasive sales personnel.

Moreover, many or most institutional investors may have known or assumed that Crazy Eddie employed unethical or illegal sales practices. Crazy Eddie's well-known television advertisements suggested that the company sold products near cost, yet its financial statements indicated a healthy profit margin from such sales. Investors could only conclude that Crazy Eddie did not sell most of its products at or near cost.

Plaintiffs have offered no evidence, and the court finds no reason to believe, that Crazy Eddie's securities would have sold at a higher price (or that any such marginal increase could be measured) had the Underwriters described the company's sales practices. Thus, any omission or misrepresentation of facts was not material.

### 3. Loans to Crazy Eddie Officers

■ According to Sam E. Antar, Crazy Eddie failed to disclose in the March 1986 prospectus several loans from Crazy Eddie to certain of its officers. Crazy Eddie's outside counsel, James Purcell of Paul, Weiss, Rifkind, Wharton & Garrison, learned of this omission in a meeting before the June 1986 offering and angrily upbraided Sam E. Antar, apparently in the presence of representatives of some or all of the Underwriters. These loans were reported in the final prospectus issued in connection with that offering.

The Underwriters contend that such loans, totalling $207,818 as of March 1986 and constituting two-tenths of one percent of Crazy Eddie's then-current assets, are immaterial as a matter of law. They are not correct. Crazy Eddie had historically failed adequately to document unprofitable loans from the company to its officers and Antar family members. Moreover, it had represented in the March 1986 prospectus that it would only make loans to officers under restricted circumstances and would report all such loans to stockholders.

■ Even if Crazy Eddie's description of loans constitutes a material misrepresentation in the March 1986 prospectus, plaintiffs have offered no evidence that the Underwriters knew of or recklessly disregarded evidence of such loans when they prepared that prospectus. Moreover, plaintiffs have made no argument suggesting that their losses can be attributed to the misrepresentation of such loans in the prospectus.

### 4. Wrongdoing in connection with St. Lucia Medical School

■ Plaintiffs contend that a representation regarding the University of St. Lucia School of Medicine, Ltd. (the "St. Lucia Medical School") was materially misleading. The prospectuses stated that:

> From time to time prior to May 31, 1984, the Company sold merchandise from, and made short-term loans for working capital to companies ... controlled by Eddie Antar, Sam Antar ... includ[ing] ... the University of St. Lucia School of Medicine, Ltd.

Plaintiffs submit deposition testimony by Missett, the Salomon analyst, that he had heard, possibly in 1984, that the St. Lucia School was a "sham."

The court cannot determine from the papers the nature of this alleged "sham." Plaintiffs have offered no evidence, beyond the vague hearsay comment by Missett, that any fraudulent scheme existed. Without more, a jury could not reasonably find an omission of a material fact.

■ Even if plaintiffs had raised a genuine issue regarding the materiality of this alleged omission or misrepresentation, they have not shown scienter. Sam E. Antar said in a deposition that he and others had deliberately concealed the underlying nature of the St. Lucia Medical School controversy from the Underwriters and auditors. Moreover, plaintiffs do now explain how their losses can be attributed to this misleading disclosure, viewed in isolation.

### 5. Decline of comparable store sales and "pressure on margins"

■ Plaintiffs contend that the March 1986 prospectus failed to disclose (i) that the rate of growth of comparable store sales had begun to decline in January and February of 1986 and (ii) that Crazy Eddie was experiencing "pressure on margins" as a result of management's decision to sacrifice marginal profits on sales in order to maintain market share. Sam E. Antar has testified that he informed the Underwriters of these two developments.

With respect to the decline in comparable store sales growth, plaintiffs do not accurately describe representations contained in the March 1986 prospectus. Under "Recent Developments," it reported that (i) net sales had increased 56.7 percent for the year ended March 1986 but only 52.5 percent during the fourth quarter, and (ii) comparable store sales increased 17 percent during the full year but only 14 percent during the fourth quarter. Plaintiffs have adduced no evidence that such disclosures were materially misleading.

With respect to the alleged decision to place "pressure on margins" in order to maintain market share, Sam E. Antar concedes that Crazy Eddie management "did not view gross margins per se as the driving force at that time relating to the public offering." Thus, plaintiffs' evidence suggests only that the decision was not material.

But assuming plaintiffs accurately describe the decision to reduce margins in order to maintain market share as a material change in corporate strategic policy, the court finds that plaintiffs have come forward with no evidence that the decision touches on the reasons for the collapse in value of Crazy Eddie securities or that plaintiffs' losses were otherwise foreseeably caused by this omission.

### 6. Corporate mismanagement

Last, plaintiffs seemingly contend that the Underwriters failed to disclose their conclusions that Crazy Eddie had insufficient and unreliable controls, audit procedures and computer systems, and that the company's management lacked credibility, reliability, diversification and professionalism.

Plaintiffs have cited, and the court knows of, no authority imposing liability under section 10(b) upon an underwriter which fails to disclose conclusory evaluations of a corporation's management. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 639 (3d Cir.1989), a case cited by plaintiffs, makes plain that "allegations of failure to disclose mismanagement alone do not state a claim under federal securities laws." To prove a claim plaintiffs must show that defendants failed to disclose specific material facts. *See also Ballan v. Wilfred American Educational Corp.*, 720 F.Supp. 241, 249 (E.D.N.Y. 1989) (holding that Rule 10b-5 does not compel a corporation to direct conclusory allegations at itself or to characterize its behavior in a pejorative manner). Thus the court does not view the Underwriter's failure to disclose conclusions about Crazy Eddie management as an omission of "fact."

Plaintiffs have pointed to no specific facts, beyond the five circumstances already examined, that the Underwriters knew or disregarded the obvious fact that Crazy Eddie had unreliable controls, audit procedures, and computer systems.

The court examines, in Part II–C below, plaintiffs' conclusory allegation that Crazy Eddie management was neither credible nor reliable.

### C

The court next views the evidence as a "mosaic."

Construed in a light most favorable to the plaintiff, the papers show, in summary, that the Underwriters knew or deliberately disregarded evidence that (1) a Peat Marwick auditor refused for unexplained reasons to provide comfort with respect to a product sales table before the Peat Marwick partner in charge agreed to provide comfort, (2) Crazy Eddie engaged in "bait and switch" sales practices, (3) Crazy Eddie failed to disclose $207,818 in loans to insiders in the March 1986 prospectus despite representations that it would disclose all such loans, (4) Eddie Antar and Sam E. Antar previously had been accused of fraudulent conduct in connection with the St. Lucia Medical School, and (5) the company chose to retain market share by placing "pressure on margins."

### 1. Whether the Underwriters ignored lying

Plaintiffs contend (i) that from these facts the Underwriters learned, in the course of their due diligence inquiries, that Crazy Eddie was engaging in unethical and illegal business practices and was lying to the Underwriters about material aspects of their operations, and (ii) that such knowledge should have led the Underwriters to discover "the fraud" being perpetrated by Crazy Eddie. Plaintiffs point, in particular, to incidents involving the product sales table and loans to insiders.

The circumstances surrounding the table support no such inference. The evidence shows, to the contrary, that the Underwriters were extremely aggressive in satisfying themselves that the table was accurate and was based on reasonably reliable data. Sam E. Antar, plaintiffs' principal witness of the events, said that Stephen H. Tishman of

Bear Stearns had "bust[ed] ... chops" in his due diligence inquiries. Little significance can be attached to LaForgia's initial refusal to provide comfort once Ferrara agreed to provide comfort.

The Underwriters had no reason to believe that Peat Marwick had falsely stated that it had examined an internal sales report that, according to Sam E. Antar, had not yet been fabricated. The Underwriters acted with appropriate caution by reviewing the Department Category Sales Report after the effective date of the March 1986 offering. They had no way to determine that, again according to Sam E. Antar, the report they examined was a falsified computer print-out.

The circumstances surrounding Crazy Eddie's failure to disclose loans in the March 1986 prospectus also does not suggest that the Underwriters generally knew that Crazy Eddie management "was lying ... about material aspects of their operations." At most, Crazy Eddie's failure to list those loans constituted a material misrepresentation and suggested that Crazy Eddie management was extremely careless and that it had engaged in self-dealing.

But these two incidents, together with evidence that Crazy Eddie engaged in misleading sales practices and that Eddie Antar and Sam E. Antar had been accused of fraud in connection with the St. Lucia Medical School, could not lead a jury reasonably to conclude Crazy Eddie management was lying to the Underwriters about material aspects of its operations or was not credible.

■ Even if the Underwriters had believed that management was not reliable, plaintiffs have not explained how such knowledge could have led them to discover the fraud being perpetrated by Crazy Eddie. That fraud, as explained in Part I of this opinion, was based on misrepresentations in financial reports, fraudulent skimming of receipts, and fraudulent inventory transactions. Short of conducting a financial audit, which plaintiffs do not contend Underwriters should have done, the Underwriters were not in a position to discover any of the fraudulent schemes which caused injury to plaintiffs.

■ And even if plaintiffs could explain how the Underwriters might have discovered the fraud, plaintiffs fail to raise a genuine issue as to whether the Underwriters deliberately shut their eyes to the fraud. At most plaintiffs' argument suggests that the Underwriters were negligent.

2. *Reliance on "comfort" letters*

■ Plaintiffs also contend that the Underwriters improperly rely, as a defense, on comfort letters from Crazy Eddie's outside auditor and general counsel. In support of this contention, they cite *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir.1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) (claims under § 14(e) of the 1934 Act); *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 582 (E.D.N.Y.1971) (claims under §§ 12(2) and 17(a) of the Securities Act of 1933 and §§ 10(b) and 14(e) of the 1934 Act); and *Escott v. Barchris Construction Corp.*, 283 F.Supp. 643 (S.D.N.Y.1968) (claims under § 11 of the Securities Act of 1933).

This claim, too, suggests only that the Underwriters were negligent in their due diligence inquiries. None of the cases cited by plaintiffs involves only section 10(b) claims. Assuming plaintiffs could show that the Underwriters placed too much reliance on comfort letters and failed to conduct its own inquiries, the court concludes such a showing does not establish that the Underwriters acted with intent to deceive or in deliberate disregard of fraudulent conduct.

3. *Whether conduct by Crazy Eddie known to the Underwriters was a part of the fraud*

■ Plaintiffs contend, last, that at least some of the facts known or deliberately disregarded by the Underwriters were a part of the "massive fraud" perpetrated by Crazy Eddie management.

This contention lacks merit. None of the five factual circumstances offered in evidence by plaintiffs, summarized at page 315, contributed in any manner to the collapse of Crazy Eddie securities. Plaintiffs have offered no evidence that the St. Lucia Medical

School scheme, Crazy Eddie's sales practices, Crazy Eddie's lack of professional management, or the loans to insiders were part of those fraudulent schemes or caused the value of Crazy Eddie securities to collapse. The remaining allegations—that Crazy Eddie lied about the table and that the Underwriters failed to disclose certain recent developments—cannot be construed as a part of a fraudulent scheme.

Moreover, plaintiffs have made no showing that they were injured because they were induced to retain their Crazy Eddie securities as a result of these five circumstances.

### III

Plaintiffs have failed to create a genuine issue as to whether the Underwriters deliberately or recklessly disregarded evidence of any of the fraudulent schemes at Crazy Eddie that caused losses for these plaintiffs.

The Underwriters' motion for summary judgment with respect to claims arising under section 10(b) of the 1934 Act is granted.

Plaintiffs' motion to reargue is denied.

So ordered.