**In re CRAZY EDDIE SECURITIES LITIGATION.**

**Nos. CV 87–0033, CV 90–3181 and CV 91–4450.**

United States District Court, E.D. New York.

June 11, 1993.

Sirota & Sirota (Howard B. Sirota, of counsel), Milberg, Weiss, Bershad, Specthrie & Lerach, Pomerantz, Levy, Haudek, Block & Grossman, Stull, Stull & Brody, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., Kaufman, Malchman, Kaufman & Kirby, Law Offices of Harvey Greenfield, Christopher Lovell, P.C., Law Offices of Joseph H. Weiss, Abbey & Ellis, New York City, for class plaintiffs.

Milbank Tweed Hadley & McCloy, Las Angeles, CA and New York City (C. Stephen

Howard, Suzanne Toes, of counsel), for plaintiff Oppenheimer–Palmieri Fund Ltd.

Folkenflik & McGerity, New York City (Max Folkenflik, Margaret McGerity, of counsel), for plaintiffs Entertainment Marketing Inc. and Elias Zinn.

Cadwalader, Wickersham & Taft, New York City (Howard R. Hawkins, Jr., of counsel), for Crazy Eddie, Inc.

Shearman & Sterling, New York City (Joseph McLaughlin, of counsel), for defendants Peat Marwick Main & Co. and KMG Main Hurdman.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Steven Glassman, of counsel), for defendant Oppenheimer & Co., Inc.

Davis, Markel & Edwards, New York City (Thomas J. Sweeney, III, of counsel), for defendant Peat Marwick Main & Co.

Weil, Gotshal & Manges, New York City (Dennis J. Block, of counsel), for defendants Salomon Bros. Inc., Bear, Stearns & Co. Inc. and Wertheim Schroder & Co., Inc.

Wilson Elser Moskowitz Edelman & Dicker, New York City (Richard Oelsner, of counsel), for defendants Penn and Horowitz, J. Liebman & Co., Gary Perlmutter and Mark Halperin.

Hoffman & Pollok, New York City, for defendants Jacob Tambor, Sasson Cohen and Zazy Intern. Corp.

Rosenman & Colin, New York City, for defendants Leonard Rubin, Richard Portnoy and Wren Distributing Co.

Warner & Joselson, New York City (Jonathon D. Warner, Sheryl L. Bregman, of counsel), for defendant Sam E. Antar.

Beldock Levine & Hoffman, New York City (Brian E. Maas, of counsel), for defendant Isaac Kairey.

Leader & Berkon, New York City (Frederick D. Berkon, of counsel), for defendants Eddy Antar, Solomon E. Antar, Edmond Levy, William H. Saltzman, Steve Pasquariello and Carl G. Zimel.

David M. Rubin, New York City, for defendant Abraham Grinberg.

Morgan, Lewis & Bockius, New York City (Kevin T. Rover, of counsel), for defendant David V. Panoff.

Kelley, Drye & Warren, New York City (John P. Marshall, of counsel), for defendant James H. Scott, Jr.

Eddie Antar, pro se.

Eddie Gindi, pro se.

Jean Cocchiara, pro se.

Kathleen Morin, pro se.

David Neiderbach, pro se.

Arnold Spindler, pro se.

Hellring Lindeman Goldstein & Siegal, Newark, NJ (Stephen L. Dreyfuss, Matthew E. Moloshok, of counsel), for defendants Danielle Antar, Deborah Rosen Antar, Gabrielle Antar, Simone Antar, Nicole Antar and Noelle Antar.

Law Offices of Raoul Lionel Felder, P.C., New York City, for defendant Deborah Rosen Antar.

Gersten, Savage, Kaplowitz & Curtin, New York City, for defendants Michelle Antar, Rose Antar, Rose M. Antar, Rori Antar, Sam A. Antar, Sam M. Antar, Allen Antar, Adam Kuszer, Benjamin Kuszer, Ellen Kuszer, Simon Kuszer and Lillian Rosen.

Kostelanetz Ritholz Tigue & Fink, New York City, for defendants Rose Antar and Sam M. Antar.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

These cases arise from the alleged fraudulent and negligent conduct of defendant Eddie Antar (Antar) and his relatives and the officers, directors, auditors, underwriters, employees and vendors of the consumer retailer Crazy Eddie, Inc. (Crazy Eddie) (now in bankruptcy). The parties (except Antar) have reached and informed the class plaintiffs of a proposed settlement.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure class plaintiffs move for an order approving the proposed settlement as fair, reasonable and adequate, and for an award of attorneys' fees and disbursements.

The court assumes familiarity with its previous published memoranda and orders dated December 30, 1988, *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962 (E.D.N.Y.1988); May 15, 1989, *In re Crazy Eddie Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 94,507, 1989 WL 56142; June 16, 1989, *In re Crazy Eddie Sec. Litig.*, 714 F.Supp. 1285 (E.D.N.Y.1989); August 30, 1989, *In re Crazy Eddie Sec. Litig.*, 104 B.R. 582 (E.D.N.Y.1989); June 13, 1990, *In re Crazy Eddie Sec. Litig.*, 131 F.R.D. 374 (E.D.N.Y.1990); June 19, 1990, *In re Crazy Eddie Sec. Litig.*, 740 F.Supp. 149 (E.D.N.Y. 1990); September 19, 1990, *In re Crazy Eddie Sec. Litig.*, 747 F.Supp. 850 (E.D.N.Y. 1990); March 6, 1991, *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39 (E.D.N.Y.1991); May 1, 1992, *In re Crazy Eddie Sec. Litig.*, 792 F.Supp. 197 (E.D.N.Y.1992); September 4, 1992, *In re Crazy Eddie Sec. Litig.*, 802 F.Supp. 804 (E.D.N.Y.1992); January 20, 1993, *In re Crazy Eddie Sec. Litig.*, 812 F.Supp. 338 (E.D.N.Y.1993); and January 27, 1993 (amended March 10, 1993), *In re Crazy Eddie Sec. Litig.*, 817 F.Supp. 306 (E.D.N.Y. 1993).

# I

## A

The backgrounds facts, in summary, are these.

Antar, the founder of Crazy Eddie, together with relatives and associates, engaged in a series of schemes between 1980 and 1987 designed initially to embezzle money from the company and later falsely to portray Crazy Eddie as a thriving commercial enterprise so that Antar and others could sell their shares at an inflated price. Allegedly Antar realized $72,245,649, his father, Sam Antar, $16,857,332, and other family members and associates substantial if less bountiful sums.

These schemes collapsed when, on November 6, 1987, a group of private investors gained control of the company. Thirteen days later the new management announced that Crazy Eddie had overstated its inventory by some $45 million (an amount later revised upward).

The first of the present actions, 87 CV 33, was filed soon thereafter. In the next five and a half years class counsel reportedly conducted 232 days of depositions, analyzed more than a million pages of documents, engaged in substantial additional discovery, and briefed and argued the many motions that this court has addressed in numerous opinions.

On April 25, 1990, the court entered a default against Antar as a discovery sanction in 87 CV 33, and deferred entry of judgment against him until the liability, if any, of the other defendants was established. Most of the remaining defendants have energetically contested liability.

On March 6, 1991, in the principal action the court certified a class consisting of purchasers of Crazy Eddie securities from September 13, 1984 (the effective date of Crazy Eddie's first public offering of common stock) through January 18, 1988 (the date when the company, under new management, announced that company inventory had been overstated by $65 million). The class excludes the defendants and their immediate families.

At this time, the class plaintiffs have claims in the principal action for violations of (i) section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§ 78a *et seq.*, against Antar family members and the company's former directors, officers, accountants, agents, and one underwriter, (ii) section 20 of the Exchange Act and section 15 of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, against Crazy Eddie directors and officers (as controlling persons), and (iii) the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, against Antar and certain individual defendants. At this time, the court has not decided class plaintiffs' pending motion to amend the complaint to include a RICO claim against Crazy Eddie's former accountants.

## B

The proposed settlement provides, in substance, the following.

The settling defendants (that is, all defendants in all cases except Antar) would pro-

vide up to $42 million for a common fund from which class members would make claims and class counsel would be compensated. Claiming class members would receive a net amount of approximately 6% of their losses (the actual percentage would vary slightly, depending on the total claims made and the amount of attorneys' fees and expenses awarded). If class members make claims of $425 million (the maximum potential claims estimated by plaintiff's expert) and the attorneys' fee request is granted, the class would receive a total net benefit of about $25.8 million. If class members make claims of only $300 million, the class would actually receive a net benefit of about $17.63 million.

Class counsel seek fees of $14.2 million and reimbursement of expenses of $2 million, to be paid from the settlement fund. If after paying claims, attorneys' fees, and expenses, the settlement fund is not exhausted, the surplus would revert to the settling defendants.

In exchange class members would release all settling defendants (except, under certain circumstances, Antar's former wife, Deborah Ann Rosen, and her children) from all claims that have been or could have been raised in these cases.

The class may (and class counsel report that they intend to) seek the entry of judgment against Antar. Class counsel report that some $60 to 70 million, much of it in banks outside the United States, has been frozen by the United States District Court for the District of New Jersey, where Antar and others face criminal prosecution.

Class counsel estimate that the class ultimately will receive $30 to $50 million from these funds. Counsel report making a material contribution to the Securities and Exchange Commission's successful efforts to locate and freeze these assets. And they urge the court to give some weight to this projected benefit in deciding whether to approve the proposed settlement and request for attorneys' fees.

## II

Class plaintiffs move for an order pursuant to Rule 23(e) of the Federal Rules of Civil Procedure approving the proposed settlement. That rule provides that a class action "shall not be dismissed or compromised without the approval of the court."

■ In making such a determination, a court examines both the process by which a proposed settlement is reached, and specific factors that suggest whether or not the settlement is fair, reasonable, and adequate. "[A] district court has the fiduciary responsibility of insuring that the settlement is fair and not the product of collusion, and that class members' interests were represented adequately." *In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986). The factors for the court to consider include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to settlement; (3) the stage of the proceedings and the amount of discovery; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974).

■ The court has substantial familiarity with the process by which the agreement was reached. The court has had extensive contact with able class counsel who, for five and a half years, have capably represented the class. Every stage of the litigation was hotly and competently contested. The settlement agreement was reached after the underlying facts had been fully developed and only through arduous arms-length negotiations involving, at times, former Magistrate Judge Zachary W. Carter. It plainly is not the product of collusion among the parties.

The proposed settlement appears to be eminently fair and reasonable. It is true that class plaintiffs' expert estimated class

members would be entitled to recover $425 million had they prevailed at trial on their securities fraud claims. Had they succeeded on their RICO claim, they would be entitled to more. In return for giving up a right to pursue a judgment of $425 million or more, they receive the right to make claims of up to $42 million (less fees and costs), plus the right to collect from the frozen Antar assets. This suggests that claiming class members will receive ten cents for every dollar lost (6 cents net after fees and expenses).

But, this calculation is misleading. Not every class member can be expected to make claims, and those who do claim may reasonably expect to be compensated later from the Antar frozen assets. If, for example, the class claims $300 million, the attorneys receive the requested $16.2 million in fees and expenses, and the class ultimately nets $30 million from the frozen Antar assets, the claiming class members will receive benefit of about 21 cents for every dollar lost (16 cents after deducting fees and expenses). This recovery, where the company is in bankruptcy and alleged primary wrongdoer took elaborate steps to secrete assets, is substantial.

Moreover, the settlement eliminates significant risks posed by continued litigation. Even if plaintiffs succeeded in their securities and RICO claims against all or some of the settling individual defendants, those individuals appear unable to pay a judgment on the scale offered here.

The Crazy Eddie directors and officers were reportedly insured for up to $15 million for at least some of the conduct alleged. But there was a substantial likelihood that the insurer would refuse to pay on a fraud verdict because the insurance policy reportedly exempts intentional conduct from coverage. Moreover, the insurance had already been eroded by the directors' and officers' substantial litigation expenses.

The securities fraud claim against the sole underwriter remaining in the principal action was subject to be eliminated. This court granted summary judgment, reportedly under similar facts, to three other underwriters on January 28, 1993 (amended March 10, 1993). The remaining underwriter's motion for summary judgment is pending.

The proposed RICO claims against the accountants also rested on precarious footing. To prevail plaintiffs would have had to prove, under the test newly adopted in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), that the accountants had participated or conspired to participate in the management or operation of Crazy Eddie. The parties report that plaintiffs were highly unlikely to make such a showing.

Therefore, the class plaintiffs' most promising prospect of obtaining a result better than the proposed settlement depended on proving at trial that the accountants had engaged in securities fraud. To do so, they would have to show that the accountants' fraudulent conduct had been knowing or reckless. To do that, they would have to rely heavily on the testimony of Sam E. Antar (Crazy Eddie's indicted former chief financial officer). They would also probably have had to discredit the testimony of a current or former partner of a prominent accounting firm.

Even if the class plaintiffs were willing to assume each of these litigation risks, the passage of time would introduce yet more risks. Whatever victory might be eventually attained was hardly imminent. The parties would have to wait for a trial date. Defendants would undoubtedly appeal to the Court of Appeals and, perhaps, seek a writ of *certiorari* from the Supreme Court. Given the recent minting of some of the applicable law, the parties risked the possibility of a reversal and second trial. As they waited, the class members would have risked the dissipation of individual defendants' assets, personal and institutional bankruptcies, the further erosion of the director's and officer's insurance, and other refinements of the applicable law.

Finally, the court notes that no one contends that the basic proposed settlement is inadequate, unreasonable, or unfair. Some 54,057 notices of the proposed settlement were mailed by April 30, 1993 to class members. Notices were also published in the national editions of the *New York Times* and *The Wall Street Journal*. These notices elic-

ited at the hearing on May 27, 1993 an objection from only one person, and he challenged not the underlying settlement, but the proposed attorneys' fees.

In view of the substantial proposed benefit to the class, the prospect of further recovery from the Antar assets, the complexity of the case, the risks associated with pursuing the case to judgment, and the absence of any objection, the court finds that the proposed settlement is fair, reasonable, and adequate.

### III

■ Class counsel request attorneys' fees of $14.2 million and a reimbursement of $2 million for expenses, both to be deducted from the $42 million settlement. They have submitted affidavits from 11 of the 12 law firms representing the class, indicating that counsel and paralegals devoted 29,811.72 hours to these cases for which they would bill, were this a non-contingency matter, $8,291,661.75.

### A

■ Where a common fund has been created to be shared by a class, the attorneys who created that fund are entitled to an award of fees and expenses from that fund. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882). The rule allows for the cost of litigation to be spread proportionately among each of the beneficiaries, prevents unjust enrichment by class counsel at the expense of the class, and provides an incentive to the bar to pursue cases where the prospect of compensation is uncertain and remote in time.

Historically, fees in common fund cases have been calculated based on a percentage of the fund. *See, e.g., Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885) (applying percentage-of-recovery method but reducing percentage from 10% to 5%); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 688 (M.D.Ala.1988) (recounting the history).

But in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), *appeal following remand,* 540 F.2d 102 (3d Cir.1976), the Court of Appeals for the Third Circuit applied the so-called "lodestar" analysis to a common fund case. Under this approach, the court first calculates a lodestar by multiplying the number of hours reasonably devoted to the case times a reasonable hourly rate. That result is then adjusted up or down to reflect such factors as the quality of the work and the risk to counsel of little or no compensation.

The following year the Second Circuit rejected the percentage-of-recovery method in a common fund case, holding that the lodestar method was "the only legitimate starting point for analysis." *Grinnell Corp.,* 495 F.2d at 471.

A decade later, the tide shifted again. First, the Supreme Court noted in dicta that "under the 'common fund doctrine' ... a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984).

Shortly thereafter, Chief Judge Aldisert, the author of the *Lindy* opinion, convened a task force that concluded that the lodestar approach should be abandoned in common fund cases. The task force found that it unnecessarily overtaxed the judicial system, created an illusory sense of mathematical precision leading to disparate results, was easily manipulated by judges, and created disincentives to an early settlement. *See Court Awarded Attorney Fees: Report of the Third Circuit Task Force,* 108 F.R.D. 237, 246–49 (1985).

Others have favored the percentage-of-recovery method because it more closely aligns the interests of the class and its counsel. *See, e.g.,* John Coffee, "Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of the Law Through Class and Derivative Actions," 86 Colum.L.Rev. 669, 724–25 (1986).

Since at least the late 1980s the trend within this circuit has been toward the percentage-of-recovery method. *See, e.g., Chatelain v. Prudential–Bache Sec., Inc.,* 805 F.Supp. 209, 215–16 (S.D.N.Y.1992) (favoring

and applying percentage-of-recovery method); *Breiterman v. Roper Corp.,* [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, 1990 WL 15535, *3, 1990 U.S.Dist. LEXIS 328, *9 (S.D.N.Y. Jan. 12, 1990) ("This court favors the percentage approach, and agrees with the critics of the lodestar method that lodestar awards promote inefficiency and impose unnecessary burdens on the court"); *Brown v. Steinberg,* Fed.Sec. L.Rep. (CCH) ¶ 95,680, 1990 WL 61023, 1990 U.S.Dist. LEXIS 13516 (S.D.N.Y. Oct. 12, 1990) (applying the lodestar method but explicitly stating a preference for the percentage-of-recovery method); *In re Union Carbide Corp. Consumer Products Business Sec. Litig.,* 724 F.Supp. 160, 170 (S.D.N.Y.1989) (noting that a percentage award "is consistent with the new learning" and will "take us back to straight contingent fees bereft of largely judgmental and time-consuming computations of lodestars and multipliers"). *See also In re Gulf Oil/Cities Service Tender Offer Litigation,* 142 F.R.D. 588, 596–597 (S.D.N.Y.1992) (approving percentage method and awarding 30% of fund).

Consistent with this trend, the Eastern District of New York adopted on December 17, 1991 the "Civil Justice Expense and Delay Reduction Plan" which provides, in section V(A)(2), that attorneys' fees in common fund cases in which significant attorney time has been expended shall be based on a percentage of the recovery. In such cases, the attorneys must submit time records, as is required under the lodestar approach, and those records are to serve as a guideline in setting the percentage recovery.

While there is no general rule as to what percentage of a common fund may reasonably be awarded as a fee, many courts have awarded between 20% and 30%, with very few awarding more than 50%. *See Mashburn,* 684 F.Supp. at 692–93 (reviewing cases). Some courts have adopted 25% as a "bench mark" which may be adjusted in light of such factors as (1) the effort expended by class counsel, (2) the risk assumed by class counsel, (3) the result obtained, (4) the value of other benefits to be obtained by the class, and (5) the absence of objections from class members. *See id.*

Such factors may reasonably lead a court to award attorneys' fee in excess of 33%, even where (unlike here) the class could not expect an additional benefit from another source. Indeed, class counsel cite some 37 cases nationwide (eight within the Second Circuit) in which fees equalled or exceeded 33% of the common fund, some of similar magnitude to this case. *See, e.g., In re Wedtech Sec. Litig.,* M21–46 (LBS), MDL 735, No. 86 CV 8628, slip op. at 10–11 (S.D.N.Y. July 31, 1992) (awarding attorneys' fees equal to 33⅓% of gross settlement fund of $53 million).

### B

In this case, the fees sought of $14.2 million represent 33.8% of the proposed settlement fund. The request is reasonable. First, it represents a reasonable multiple of the hours spent. Eleven of the twelve firms representing the class report spending nearly 30,000 hours, for which they calculate a lodestar of $8,291,661.75. No one has suggested that any of these hours were wasteful or duplicative.

Second, class counsel made a substantial investment of time with no certainty of compensation. They could not know at the outset either that they could prove that a deep-pocketed institution had knowingly or recklessly engaged in securities fraud or that they could find and freeze Antar assets.

Third, class counsel exhibited sustained and admirable tenacity in unearthing facts needed to develop these cases. They brought the first action some two years before the SEC initiated its proceedings against Antar and others. They successfully induced the cooperation of Antar family members in determining the details of various fraudulent schemes and the location of Antar assets.

Fourth, class counsel's efforts may reasonably be expected to have created a benefit beyond the immediate settlement proposed here. If the class members receive $30 million from the Antar assets (in addition to a maximum benefit here of $42 million), the proposed attorneys' fees of $14.2 million would constitute less than 20% of the total

benefit made available for claims by class members.

And last, as noted above, only one person has opposed the fee. One purported class member, Sal F. Laurenzano, has contended that attorney fees of 20% to 25% are sufficient and that courts should only award a higher percentage when the size of the common fund is relatively small. He provides no particular reasons why the percentage should not exceed 25% in this case.

This court sees no reason to adopt a *per se* rule limiting attorneys' fees to 25%. To do so would prevent the court from considering the full risk taken and the full benefit provided by class counsel. It would also prohibit the court from giving some weight to the prospect of further recovery by the class as a result of class counsel's efforts.

Even if this court were to apply the lodestar method, the requested fee is reasonable. In particular, class counsel's proposed multiplier of 1.72 is readily justified, given the risks taken by class counsel. Indeed, in a recent securities class action the United States District Court for the Southern District of New York observed that " '[i]n recent years multipliers of between 3 and 4.5 have been common.' " *Rabin v. Concord Assets Group, Inc.,* [1991–1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,471 at 92,081, 1991 WL 275757 (S.D.N.Y.1991) (quoting *O'Brian v. National Property Analysts,* No. 88 CV 4153 (S.D.N.Y. July 27, 1989)).

The court approves an award of $14.2 million in attorneys' fees (representing approximately 33.8% of the $42 million settlement fund) and $2 million in disbursements, to be paid from the $42 million fund to be created as a result of the proposed settlement. Pursuant to paragraph 14 of the Stipulation of Settlement, such fee shall be deposited into an escrow account within three business days of the date of this order, and class counsel shall be entitled to a proportional share of any accrued interest from the date of deposit.

### C

The Firm of Harvey Greenfield, one of the twelve firms representing class plaintiffs, disputes a proposed allocation of fees and disbursements among the firms.

Prior to submitting a request for attorney's fees, the Executive Committee of class counsel sought and received affidavits from each of the class counsel. Presumably based upon these time records, the committee's familiarity with the tasks performed by each firm, and other relevant factors, the committee reportedly proposed an allocation of attorneys' fees and expenses which was circulated to the firms involved. All reportedly agreed to the allocation except the Greenfield firm.

Mr. Greenfield has submitted an affidavit indicating that his firm devoted 626.25 hours to this litigation for which it would customarily charge, if this were a non-contingency matter, $293,300. It has submitted time records, generally rounded to the nearest hour or half hour (some to the nearest quarter hour), showing that the firm charges $500 for an hour of Mr. Greenfield's time and $125 for an hour of paralegal time. Mr. Greenfield implies that, because class plaintiffs request compensation equal to approximately 1.72 times their lodestar, he should receive $504,476 as compensation.

Despite the resolute questioning by this court at oral argument, Mr. Greenfield has not been able to explain with any specificity what he did and how he benefitted the class. He insisted in general terms that he did everything assigned to him by the Executive Committee and "nothing that was inappropriate." He also said he kept his clients informed of developments in the case and defended two depositions.

At the hearing Howard Sirota, Chairman of the Executive Committee, reported that the Greenfield firm was assigned three minor tasks and estimated that the charge for the work should not have exceeded $25,000.

The court is unable to understand whether and how the Greenfield firm contributed to the settlement from which class members will benefit. It cannot resolve this dispute on the present papers.

The Executive Committee is directed to file with the court, within ten days of the date of this order, a proposed allocation of the $14.2 million in attorneys' fees and the $2 million for disbursements. Such proposal should include an allocation for the Greenfield firm insofar as the Executive Committee believes that that firm is entitled to compensation for time and expenses.

Within seven days of the filing of such proposed allocation, any firm representing plaintiffs (including the Greenfield firm) may file an objection together with an affidavit describing its material contribution to the case and detailing time devoted to such work. Such affidavit should distinguish the hours devoted to tasks assigned by the Executive Committee from the hours devoted to matters that objecting counsel independently determined to be appropriate.

Within three days of the filing of any such objection, the Executive Committee may submit a reply.

The court should advise Mr. Greenfield that it does not intend to parse through a substantially unjustified attorney's fee application as did our sister court in *Kronfeld v. Transworld Airlines, Inc.*, 129 F.R.D. 598 (S.D.N.Y.1990). There, Mr. Greenfield requested fees for a total of 860.75 hours, representing the time he allegedly spent discussing the case with clients, preparing for and attending depositions, and preparing his attorney fee application. After tediously analyzing his submission, that court reduced his lodestar from $271,665 to $112,948.50.

If Mr. Greenfield makes an application that is substantially unjustified in relation to the work he was required to perform for this lawsuit, the court will consider what steps to take to deter future such applications. By order signed on August 19, 1988, this court constituted an Executive Committee of class counsel and provided, so as to minimize waste and duplicative efforts, that all work by class counsel be performed under the direction and coordination of the Executive Committee. In determining the reasonableness of the fee, the court will place great weight on the recommendation of the committee.

### IV

The court finds the proposed settlement to be fair, reasonable, and adequate, and ap-

proves the payment of $14.2 million in attorneys' fees and $2 million for disbursements, to be allocated among class counsel pursuant to a subsequent order of this court.

So ordered.