**Morton BERMAN, on Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**ENTERTAINMENT MARKETING, INC. and Elias Zinn, Defendants.**

No. 88–CV–3239 (JG).

United States District Court, E.D. New York.

Oct. 17, 1995.

Jared B. Stamell, Stamell, Tabacco & Schager, New York City, for plaintiff.

Larry H. Krantz, Leventhal Slade & Krantz, New York City, for defendant Elias Zinn.

John J. Gallagher, Corbin Silverman & Sanseverino, New York City, for Dennis S. Faulkner, Trustee of KLH Computers, Inc.

## MEMORANDUM AND ORDER

GLEESON, District Judge:

Plaintiff Morton Berman, a purchaser of securities of defendant Entertainment Marketing, Inc. ("EMI"), filed this class action against EMI and its president, defendant Elias Zinn, on October 14, 1988. Three years after the litigation commenced, EMI, then operating under a different name, filed for bankruptcy, and the action proceeded against defendant Zinn alone. The plaintiff and Zinn have since negotiated a settlement agreement, which has been submitted to this Court for approval.

### BACKGROUND

The complaint alleges that defendants made misstatements and omissions of fact in violation of the federal securities laws during the seven months between May 20 and December 16, 1987 ("the Class Period"). Plaintiff asserted that these statements artificially inflated the market price of EMI securities, to the detriment of those who purchased the securities during the Class Period.

EMI is a distributor of wholesale electronic equipment based in Houston, Texas. During the Class Period, defendant Zinn was president of EMI and owned 25% of its common stock. In 1986, after EMI had experienced significant growth, Zinn decided to expand the company into the cable television home shopping business. The thrust of plaintiff's claims is that Zinn and EMI made excessively optimistic and intentionally misleading statements about the new venture and the profits it was expected to bring to EMI.[1] Defendants maintained that all statements made about the future profitability of EMI and its subsidiaries were simply projections made in good faith and in clearly conjectural language. In addition, they pointed out repeated instances during the Class Peri-

od when Zinn disclosed EMI's losses and poor sales figures to the public, and the fact that Zinn, the single largest shareholder in EMI, did not sell any of his holdings in the company during the Class Period.

By order dated January 18, 1990, the following class of plaintiffs was certified:

All persons who purchased securities of EMI between May 20, 1987, the date on which the defendants issued a false and misleading statement and December 16, 1987, the date following the release of EMI's results for the third quarter of 1987 (the "Class Period").

EMI subsequently changed its name to KLH Computers, Inc. ("KLH"), and on April 28, 1992, KLH filed for bankruptcy in the Northern District of Texas. This filing resulted in an automatic stay of the instant action as to KLH. See 11 U.S.C. § 362(a). Plaintiff asserts that he knew at this point that he could not obtain any recovery against KLH, because its liabilities far exceeded its assets.

Both Zinn and EMI/KLH were substantial shareholders in an unrelated company, Crazy Eddie, Inc. ("Crazy Eddie"). In 1987, they and other investors brought actions for securities fraud against Crazy Eddie. These actions were consolidated in one proceeding in this district, which was captioned *In re Crazy Eddie Securities Litigation*, 87 CIV 0033 (EHN) ("Crazy Eddie Litigation"). In February 1993, the Crazy Eddie Litigation was settled for $60 million as to all defendants except Eddie Antar. KLH received $6.5 million of that settlement and Zinn recovered $950,000. On April 6, 1993, the Honorable Thomas C. Platt, who was then presiding over this case, issued a temporary restraining order prohibiting Zinn from transferring the $950,000 out of New York. In a subsequent order dated May 7, 1993, Chief Judge

---

1. Plaintiff's allegations included the following: on May 20, 1987, Zinn announced that CDN would air a home shopping comedy show that was expected to generate another $50 million of revenue, but the show was never produced; Zinn falsely stated that he paid $1 million of his own money to outfit CDN, and that all EMI employees had stock in the company; on September 9, 1987, Zinn predicted that EMI's net income for the fiscal year ending January 31, 1988, would

reach $.65 to $.75 per share, and that sales for that year would be in excess of $200 million, and did not amend this projection six days later when EMI announced that its earnings for the quarter ended July 31, 1987 had been $.05 per share on sales of $37 million; on October 21, 1987, the Wall Street Journal quoted Zinn as saying that he intended to purchase up to 500,000 shares of EMI stock, but in fact he only purchased 35,000.

Platt continued the temporary restraining order as a preliminary injunction.[2] The sum is now in the possession of Max Folkenflik, Esq., who represented KLH in the Crazy Eddie Litigation.

Meanwhile, the Securities and Exchange Commission ("SEC") brought an action against Eddie Antar, captioned *SEC v. Eddie Antar and Michael Antar*, 89 CIV 3173 (NHP) ("*SEC v. Antar*"), which is now pending in the District of New Jersey. The action seeks to collect, for the benefit of defrauded Crazy Eddie shareholders, monies that the Antar brothers secreted in foreign bank accounts and other places.[3] If the SEC is successful in that litigation, the shareholders, one of whom is defendant Zinn, will be entitled to share in the recovery.[4]

Discovery has consisted of document review and depositions, and is complete. Plaintiff examined approximately 100,000 pages of corporate records and conducted depositions of EMI's present and former top management. Plaintiff's attorney estimates that he has expended over $300,000 of billable time on the case, either performing discovery or marshaling the evidence in support of the application for injunctive relief which Chief Judge Platt granted in 1993.[5]

Over a period of more than two years that began during the litigation with the KLH bankruptcy trustee, the parties have been attempting to negotiate a settlement. Zinn's attorney intended initially to allow the case to proceed to trial, as he considered it highly defensible. However, the 1993 order enjoining Zinn from transferring the $950,000 from the Crazy Eddie Litigation deprived him of

control of what were essentially his only remaining assets. This financial pressure, which subsequent motion practice was unable to alleviate, eventually influenced Zinn to attempt to settle the case. A prior agreement was reached on January 24, 1994, but was subsequently abandoned. Discussions resumed several months later and led to the instant agreement.

The parties have stated that they were encouraged to reach this agreement by the uncertainties and delays of litigation, and by the fear that Zinn's few remaining holdings would be further depleted over time by his other creditors. In particular, plaintiff was driven by a concern that Zinn would file for bankruptcy in Texas, an event that would have divested plaintiff of the leverage he had achieved through the attachment of the $950,000. All parties have indicated that considerations of Zinn's financial standing—rather than of the merits of the case—provided the impetus for reaching the settlement.

On May 30, 1995, this Court issued a scheduling order directing the parties to provide notice of the proposed settlement to the class members. Pursuant to this order, the class members were informed by mail and by publication of their right to object to the settlement and to opt out of the class.

On July 28, 1995, a settlement hearing was held. As of that date no objections had been received. Approximately 180 class members had come forward to claim their share of any recovery.

2. The injunction gave rise to substantial litigation in the Texas bankruptcy court and before Chief Judge Platt. The primary issue, raised by the KLH bankruptcy trustee, was whether the attached amount was the property of the debtor's estate pursuant to 11 U.S.C. § 541, and therefore not subject to attachment. In pursuit of this position, the trustee attempted to hold plaintiff and his attorneys in contempt for violating the automatic stay imposed by 11 U.S.C. § 362.

3. The SEC has seized some of these funds and Antar has repatriated those that were transferred overseas. All funds that the SEC has recovered have been placed in escrow in New Jersey pending the outcome of the *SEC v. Antar* litigation.

4. The parties have stated that Zinn's net worth consists almost entirely of his claims against Crazy Eddie and Eddie Antar. (*See* Notice of Pendency and Settlement Between Plaintiff and Defendant Elias Zinn ¶ 10.) Throughout the course of this litigation, Zinn too has threatened to file for bankruptcy, and his threats have provided some of the impetus behind the proposed settlement.

5. The attorney, Jared Stamell, Esq., has stated that he expended approximately $550,000 of billable time, but that $200,000 of that amount was spent on bankruptcy issues. Mr. Stamell also stated at the settlement hearing that he did not expect to be paid for all the time he had billed working on the case.

## THE PROPOSED SETTLEMENT

The following terms constitute the settlement that the parties seek to have approved. Of the $950,000 that Zinn recovered in the Crazy Eddie Litigation, $800,000 is to be paid to Zinn. The remaining $150,000 (plus a *pro rata* portion of interest accrued since June 1993 on the $950,000) is to be placed in escrow and used to cover the costs of disseminating notice to the class members, processing their claims, and reimbursing plaintiff and his counsel for expenses incurred throughout the litigation. Plaintiff claims to have accrued a total of $58,000 of such expenses.

The amount remaining (less attorneys' fees) after these costs have been paid will become part of the class award. In addition, defendant Zinn will assign to plaintiff one half of his right to recover against Eddie Antar in *SEC v. Antar*, and plaintiff and his counsel will have full authority to prosecute that claim. Plaintiff's counsel estimates the value of such recovery at somewhere between $750,000 and $1.5 million, but admits that there may be no recovery at all. Finally, the agreement provides that if approval is not given, or if the United States Bankruptcy Court for the Northern District of Texas fails to grant all approvals necessary for performance of the agreement, the $950,000 and all interest accrued thereon, will be paid back to Max Folkenflik, Esq. as stakeholder, pending resolution of the instant action. If all the necessary approvals are given and the settlement becomes effective, the orders entered in this action on April 6, 1993 and May 7, 1993 will be vacated, and the action will be dismissed with prejudice as to both KLH and Zinn.

The parties have agreed that if approval is given, this Court will retain jurisdiction to consider plaintiff's counsel's application for an award of attorneys' fees—suggested to be 30–35% of the total class award—and for a $10,000 incentive award for the named plaintiff.

## DISCUSSION

■ Under Federal Rule of Civil Procedure 23(e), a proposed settlement of a class action must be approved by the district court. In determining whether to grant such approval, the court must evaluate the fairness, reasonableness and adequacy of the settlement. *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983); *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986). It must compare the terms of the settlement agreement with the likely result of a trial; it must also examine the conduct of the litigation and the negotiating process to ensure that it was free of collusion and coercion. *Id.* Other factors relevant to the fairness of the proposed settlement include:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Id.* at 433–34 (citing *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 684 n. 1 (2d Cir.1977)).

For purposes of the instant application for approval, the most important aspect of the proposed settlement is the $150,000 the parties have agreed to allocate to the class recovery. This amount, which will reach the class only after being significantly reduced by the expenses and attorneys' fees, seems somewhat meager, particularly when it is contrasted with the $800,000 that will go to Zinn, and with the amount of damage—over $2 million—the class is claimed to have suffered.[6] In view of its uncertainty, the prospect of an additional recovery in the *SEC v. Antar* proceeding improves the settlement only marginally.

---

**6.** Plaintiff has stated that the actual loss is $893,-590.02, which is the sum of claims class members, in their responses to the notice of settlement, have made to date.

Nevertheless, an evaluation of this proposal in light of the factors listed above requires the conclusion that it is fair and reasonable. Two aspects of the case are particularly significant. First, none of the class members have raised an objection to the proposed settlement agreement. An absence of such objections carries considerable weight in the fairness determination. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974); *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 551 (S.D.N.Y.1979) ("The absence of objectants may itself be taken as evidencing the fairness of the settlement.").

Second, it is undisputed that Zinn's financial future is at best uncertain. As stated above, his $950,000 recovery from the Crazy Eddie Litigation and his interest in the outcome of *SEC v. Antar* are essentially his sole remaining assets. Further depletion of the $950,000 was inevitable had the litigation continued, and this very prospect caused Zinn to threaten to file for bankruptcy if settlement negotiations were unsuccessful. In light of his dire circumstances, these threats were not to be taken lightly. The plaintiff's choices were to either accept the amount offered, however meager, or lose the available funds to Zinn's attorney and other creditors of both Zinn and KLH before the litigation concluded. In addition, the settlement offered a possibility that would not have existed had plaintiff chosen to pursue the litigation: that he could recover as much as $1 million at the conclusion of the *SEC v. Antar* case. These considerations support a finding that the proposed settlement is fair and reasonable. *See Heit v. Amrep Corp.*, 82 F.R.D. 130, 135–36 (S.D.N.Y.1979); *Long v. Trainor*, 583 F.Supp. 1124, 1126 (E.D.Pa. 1984).

Consideration of the risks of establishing liability and damages at trial also weigh in favor of a finding of fairness. At a trial, the jury would have to determine whether Zinn made false statements about EMI's business prospects, and if so, whether he did so intentionally or recklessly, whether any false statements made were material, and whether they affected the price of the company's stock. The parties continue to maintain the correctness of their respective positions on these issues, and it is by no means clear that plaintiff is assured of victory. The evidence that Zinn made exaggerated predictions about the value of EMI stock is contradicted by evidence that, at key times before and during the Class Period, Zinn disclosed the truth about the company's financial position. Further, several of Zinn's statements concerning company assets and policies were ambiguously worded, and a jury may not accept plaintiff's interpretations of them.[7] Finally, a trial would require a determination of the value at which the stock would have been priced, at both the beginning and the end of the Class Period, if no false statements had been made. Continued litigation consequently would have presented both sides with substantial uncertainty and risk, which they now hope to avoid by means of this mutually acceptable settlement.

The above considerations warrant the approval of this settlement. In addition, the parties' lawyers are experienced and knowledgeable in securities litigation, and the negotiating process began only after they had engaged in considerable discovery and motion practice, particularly in connection with the 1993 injunction. There is thus no reason to believe the negotiations were not conducted in good faith and at arms length, and no one has suggested otherwise. Furthermore, I am confident that having completed discovery, the parties are fully educated as to the merit of their positions and the related risks. Accordingly, I agree with their conclusion that the proposed settlement is fair, reasonable, and in the best interests of all the class members.

### ORDER

1. The terms of the proposed settlement of the instant action ("the Action") as set

---

7. For example, the context of Zinn's statement, "I opened my pocketbook and dropped one million to outfit our CDN facility with TV production equipment" indicates that it does not necessarily mean Zinn paid $1 million of his own money into the subsidiary, as plaintiff has argued. Another statement, "all of our people have very beneficial stock options," when taken in context, also may mean something quite different than plaintiff's interpretation, *i.e.*, that all EMI *managers* had stock in the company.

forth in the Stipulation of Settlement submitted by the parties, are fair, reasonable and adequate and in the best interests of the class as defined in this Court's order dated January 18, 1990 ("the Class"), and are hereby approved.

2. The plaintiff and defendant Elias Zinn are hereby ordered and directed to perform and consummate the settlement agreement described herein ("the Settlement"), *see supra* p. 116, in accordance with the terms and conditions set forth in the Stipulation of Settlement.

3. The notification that has been provided to the members of the Class regarding the Settlement is the best notice practicable under the circumstances and is in compliance with Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process of law.

4. The class action complaint filed in the Action on October 14, 1988 ("the Complaint"), is hereby dismissed without costs to any party. Any liability or claims against defendant Zinn which are based on the facts alleged in the Complaint, and which were asserted in the Complaint against defendant Zinn, or which could have been asserted in the Complaint, by or on behalf of the plaintiff or members of the Class who did not submit a request for exclusion from the Settlement, are hereby discharged.

5. The funds attached pursuant to the orders of this Court dated April 6, 1993 and May 7, 1993, are hereby released in accordance with the terms of the Settlement.

6. The plaintiff in the Action and all those who purchased securities of EMI between May 20, 1987 and December 16, 1987, inclusive, and their successors in interest (except those persons who submitted a timely and valid request for exclusion), on behalf of themselves, their heirs, executors, administrators, officers, directors, successors, assigns, and any person they represent ("the Releasors"), are hereby deemed to have released and forever discharged (and the Court hereby approves the release and discharge) of each and every class, derivative, individual and other claim, right, cause of action and issue, under the laws of the United States or any other laws, known or unknown, which the Releasors or any of them, had, now has or may hereafter have, against the defendants, or any of their present or former agents, attorneys, representatives, heirs, executors, administrators, successors and assigns which (i) has been or might have been asserted in the Complaint or in any other court or forum in connection with, arising out of or in any way related to any acts, facts, transactions, occurrences, representations or omissions set forth or alleged in the Complaint, or (ii) arises from or is in any way related to the settlement of this action; provided, however that this final order shall not release any party from its obligations under the Stipulation of Settlement.

7. Plaintiff's counsel has applied for an order approving reimbursement of expenses incurred in connection with this litigation. At the settlement hearing, Mr. Stamell indicated that the amount sought for such expenses is $58,000. The Court reserves jurisdiction to consider this application after appropriate supporting documentation has been submitted.

8. In addition, the Court reserves jurisdiction to consider plaintiff's counsel's application for an award of attorneys' fees and an incentive award to named plaintiff Morton Berman. No further notice to the Class is required so long as plaintiff's counsel limit their application to no more than 35% of the Initial Class Settlement Fund and the Final Class Settlement Fund, as those terms are defined in the Stipulation of Settlement, and so long as plaintiff and his counsel do not seek more than $10,000 to be paid from plaintiff's award of attorneys' fees as an incentive award for plaintiff.

9. The Court shall also retain continuing jurisdiction to effectuate the terms of settlement including the administration and distribution to the Class of settlement proceeds. Retention of jurisdiction shall not affect the finality of this judgment as to matters not reserved. It is expressly determined that there is no just reason for delay of the entry of judgment herein and it is expressly directed that this order be entered pursuant to

Rule 54(b) of the Federal Rules of Civil Procedure.

So Ordered.